1 | **Law Offices of David Michael Cantor, P.C.**
One E. Washington Street, Suite 1800
2 | Phoenix, Arizona 85004
Telephone: (602) 307-0808
3 | Facsimile: (602) 255-0707
**Joey Hamby SBN#15775**
4 | **Elizabeth Mullins SBN#25315**
j.hamby@dmcantor.com
5 | e.mullins@dmcantor.com
Attorneys for Defendant

6

7 | UNITED STATES DISTRICT COURT

8 | FOR THE CENTRAL DISTRICT OF CALIFORNIA

9

10

United States of America,

11 | Plaintiff, | Case No.: CR 15-341-SJO

12 | v. | DEFENDANT'S SENTENCING MEMORANDUM

13 | Kelly James Morrow, | Sentencing Date: July 18, 2016
Court: Hon. S. James Otero

14 | Defendant.

15

16

17 |       Defendant, Kelly James Morrow, by and through undersigned counsel, hereby

18 | submits his Sentencing Memorandum with Exhibits for consideration at sentencing.

19 | Mr. Morrow respectfully requests this Court accept the plea agreement and sentence

20 | him to a fifteen (15) years term in the Bureau of Prisons, to be followed by lifetime

21 | supervised release. This recommendation is consistent with the Rule 11(c)(1)(C) plea

22 | agreement and is supported by the attached memorandum of points and authorities.

23

24

25

## MEMORANDUM OF POINTS AND AUTHORITIES

### I. Introduction

On April 7, 2016, Kelly James Morrow, age 49, pled guilty to both counts of the two-count First Superseding Information: Sexual Exploitation of Children Outside of the United States, in violation of 18 U.S.C. §2251(c)(1), (c)(2)(A), (B); and Possession of Child Pornography, in violation of 18 U.S.C. §2252A(a)(5)(B), (b)(2). The sentencing range set forth in the Rule 11(c)(1)(C) Plea Agreement is 15 to 30 years in the Bureau of Prisons, to be followed by lifetime supervised release with conditions delineated in the Plea Agreement. (See Plea Agreement ¶21).

The Presentence Investigation Report recommends a Total Offense Level of 45. (PSI 4, ¶75). The parties have agreed to a Total Offense Level of 40. (Plea Agreement 16, ¶19). The Defendant has filed an objection to the Presentence Report regarding the applicability of U.S.S.G. §4B1.5(b) and the resulting five-level increase. The Total Offense Level is correctly calculated at 40 which, with a criminal history category of I, recommends a guideline imprisonment range of 292 – 365 months.

### II. Defendant's Sentencing Recommendation

In determining the appropriate sentence in a case, the Court must consider all of the factors set forth in 18 U.S.C. §3553(a) and shall impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in the statute. *United States v. Harris*, 490 F.3d 589, 593 (7th Cir. 2007), *cert. denied*, 128 S.Ct. 963 (2008). Defense counsel submits that the behavior to which Mr. Morrow pled guilty is the culmination of his own unrecognized and untreated abuse as a small boy. Mr. Morrow fought with his own demons of abuse and substance abuse but was never able to address the underlying abuse that put him on this path in his life.

2

## A. Relevant 18 U.S.C. §3553 Factors

For the Court's review, attached is a Psychological Assessment of Mr. Morrow completed by Dr. Jeffrey W. Whiting, Ph.D. (Exhibit 1) and character letters prepared by Mr. Morrow's family (Exhibit 2) to provide the Court with a more complete history of Mr. Morrow and demonstrate the tremendous amount of family support that he has.

### 1. 18 U.S.C. §3553(a)(1): Nature and circumstances of the offense and the history and characteristics of the Defendant.

On or about May 25, 2015, Department of Homeland Security Special Agent McClellan received information that Kelly Morrow had registered one or more file-sharing accounts on the Yahoo!-owned website, "Flickr." Yahoo! had closed the accounts registered to Mr. Morrow based on violations of rules related to child pornography. On May 26, 2015, Mr. Morrow arrived at Los Angeles International Airport (LAX) from Malaysia. He was detained and his electronic devices were seized.

A subsequent forensic examination of Mr. Morrow's electronic devices yielded images and videos showing that Mr. Morrow had recorded himself having sexual contact with four minor boys. Approximately 60,000 images of downloaded child pornography were also located on Mr. Morrow's laptop. There was no evidence that Mr. Morrow had ever uploaded, shared, or distributed any images to any other person. On June 5, 2015, Mr. Morrow was arrested at LAX.

1   Although it is natural to be outraged over Mr. Morrow's conduct, this

2   response should be tempered with the knowledge of Kelly's own sexual

3   victimization.  Beginning at the age of nine, he was sexually groomed and victimized

4   by a respected radiologist in his Nebraska community.

5        Mr. Morrow might have survived his sexual abuse without lasting harm if he

6   had a trusted adult to turn to. Unfortunately, his abuse coincided with the dissolution

7   of his parents' marriage, leaving him in a highly vulnerable state. After the divorce,

8   Mr. Morrow's father, Robert Morrow, abandoned his family completely. His mother,

9   Luana Unger, began drinking and started dating various men. She was rarely home

10  and Mr. Morrow and his siblings were left to fend for themselves.

11       Mr. Morrow survived his abusive and highly dysfunctional childhood,

12  outwardly intact. He went to work full-time at the age of 18 and forged an excellent

13  career installing golf courses all across America. He got married and raised three

14  daughters, all of whom are high-achieving young adults. Mr. Morrow has been a

15  caring and dedicated father to his girls. Despite these outward indicators of success,

16  Mr. Morrow could never overcome his painful and traumatic childhood. Around

17  2000, Mr. Morrow turned to drugs to deal with his underlying problems and he

18  began to use methamphetamine heavily and collect child pornography. In 2007, he

19  took a golf course installation job in China, which in turn, led to him entering into

20  what ultimately became a sexualized relationship with four boys.

4

LAW OFFICES OF
DAVID MICHAEL
CANTOR
ONE E. WASHINGTON ST., SUITE 1800
PHOENIX, ARIZONA 85004
www.dmcantor.com

1   Mr. Morrow is heartsick over his failure to seek proper counseling before his
2   unresolved problems overwhelmed him. It is noted that, until his arrest forced him to
3   take a long look at himself, including the unhealthy nature of his relationship with
4   Dr. McKinnis – which he had suppressed for decades – he had never connected his
5   wayward impulses toward male children with his own sexual abuse.
6
7   Mr. Morrow was evaluated by Dr. Jeffrey W. Whiting, Ph.D., a forensic
8   psychologist with more than thirty years of experience in the field. In his report, Dr.
9   Whiting suggests that the sexual abuse Mr. Morrow experienced during his
10  childhood, in combination with his lack of properly supportive adult role models, left
11  him highly confused with respect to the nature of healthy attachments and the proper
12  relationship between sex and love.  Dr. Whiting firmly believes that Mr. Morrow
13  was not "born with a disturbing, aberrant sexual orientation" (See Exhibit 1, at 2).
14  Rather, the negative events and interactions of his childhood resulted in a confused
15  adult state which ultimately led to his criminal conduct.
16
17  It is noted that Mr. Morrow, who is clearly in most respects a capable and
18  intelligent man, abused drugs and alcohol – in a futile attempt to hide from his pain –
19  beginning early in adolescence and continuing right up until his arrest. The fact that
20  Mr. Morrow, despite his very serious problems, managed to be a hardworking and
21  productive member of society for three decades as well as a good father to his three
22  daughters, is very much to his credit and suggests that with proper rehabilitation,
23
24                                                     5
25

LAW OFFICES OF
DAVID MICHAEL
CANTOR
ONE E. WASHINGTON ST., SUITE 1800
PHOENIX, ARIZONA 85004
www.dmcantor.com

1  upon his release from prison, he could become a productive and non-threatening

2  member of society.

3      Based on the fact that Mr. Morrow apparently has no inherent predisposition

4  toward inappropriate conduct with children, but rather engaged in the instant conduct

5  as a result of the sexual abuse and lack of guidance he suffered as a child, it stands to

6  reason that with appropriate therapy, substance abuse counseling, and rehabilitative

7  guidance, he should pose no future threat to children.

8

9      Based on all of the above including this first-time offender's willingness to

10 take all necessary steps to ensure that nothing like this ever happens again, it is

11 respectfully suggested that justice could be served in this matter by sentencing Mr.

12 Morrow to no more than 15 years of imprisonment and a lifetime of supervised

13 release, with stringent conditions to be determined by this Court and the U.S.

14 Probation Department.[1] Such a sentence would fall within the sentencing range

15 contemplated in the Rule 11(c)(1)(C) plea agreement and would be "sufficient but

16 not greater than necessary" punishment for this chastened individual, and would

17 allow him, albeit under strict supervision, to return to society at 64 years of age.

18

19     In keeping with the above and in the spirit of 18 U.S.C §3661, the following

20 social history information concerning Mr. Morrow is presented.

21

22

23 ──────────────
[1] Stringent supervised release conditions for Mr. Morrow are enumerated in detail in a subsequent section of this memorandum.

24

25

LAW OFFICES OF
DAVID MICHAEL
CANTOR
ONE E. WASHINGTON ST., SUITE 1800
PHOENIX, ARIZONA 85004
www.dmcantor.com

### a. Family Background

Kelly Morrow was born on October 8, 1966 in Hastings, Nebraska. His father, Robert Morrow, age 72, was one of four siblings and grew up in relative poverty in a poor section of Hastings. After graduating from high school, Robert went to work as a moving man. When he was 19, Robert entered into a relationship with Luana Hubby, who was four years younger and still in school. Luana gave birth to Kelly's older brother Kevin Morrow in 1963. Kevin is a master plumber and resides in Lincoln, Nebraska. Kelly and his twin brother Brian were born three years later. Brian is a Master Harley-Davidson mechanic. He is married with two children and lives in Gilbert, Arizona. Kelly's younger brother Scott Morrow, age 47, lives in Hastings, Nebraska. He is a journeyman plumber and all-around handyman.

### b. Early Childhood/Parental Incompatibility

By all reports, Kelly was an outgoing and sociable child. In an interview, Kelly described how his family was typically mid-American on the surface, and that he and his twin brother Brian got along well and did all the ordinary boy things: bikes and fishing and camping trips with family. Both Kelly and his mother Luana reported separately that beneath the veneer of normalcy, there were serious problems.

After Kelly's younger brother Scott was born, Luana went to work fulltime in a metal fabrication plant which led to her making friends of her own. Unfortunately, Robert would be driven to distraction if Luana so much as spoke to another man. He

7

got into the habit of bringing home a 12-pack of beer at night, and according to both Kelly and his mother, after drinking a few beers he would become verbally abusive toward Luana. "When Kelly tried to intervene, or even just interrupt his father's tirades against his mother, his father's rage would be directed at Kelly who would then receive a blow to his head. (Exhibit 1, at 2).

On one occasion, after a brawl with Robert, Luana packed the boys up in her Volkswagen and escaped to a friend's house in a neighboring city, where they stayed for several days.  On another occasion, Luana apparently left on her own and was gone for several weeks. Robert and Luana finally separated for good in 1997 when Kelly was 11. Kelly and his brothers moved into an apartment with Luana. Kelly rarely saw his father and his mother was frequently absent. "There was seldom any food in the refrigerator and the boys had to hustle to secure food…Kelly quickly got involved in drinking and daily marijuana ingestion." (Exhibit 1, at 2-3).

### c.  Inappropriate Early Sexualization

As bad as his home life was, Kelly Morrow would almost certainly not be facing federal charges if it were not for Dr. Lawrence McKinnis, a Hastings, Nebraska radiologist who — based on numerous reports — used his position of trust in the community to sexually groom and abuse multiple prepubescent and postpubescent children in Kelly's neighborhood and in the surrounding area.

When Kelly's family was informed that Kelly had been arrested for inappropriate activities concerning children and child pornography, Kelly's mother

8

Luana Unger wracked her brain trying to determine if there were influences in his early childhood that might have triggered this conduct more than 30 years later. It soon dawned on Luana that Dr. McKinnis had routinely spent a great deal of time with neighborhood children including her twin sons Kelly and Brian. An investigation was launched and, in interviews with various family members, as well as Luana's friend Jane Doe, and her brother John Doe 1, a disturbing profile of Dr. McKinnis emerged.

### i.  Interview with Luana Unger

On October 21, 2015, Kelly's mother Luana Unger was interviewed by Patrick Moore[2] for approximately 2½ hours at the home of Kelly's twin brother Brian Morrow in Gilbert, Arizona. Luana recalled that Dr. McKinnis first began coming around the house in 1975, when Kelly and Brian were 9 years old. The doctor would pull up in front of the house in his station wagon, often with a carload of other young boys. He typically wouldn't get out, would just sit there waiting for either Kelly or Brian to come out of the house and join them. Luana was unconcerned because not only was Dr. McKinnis a doctor, but he was also a church member and was involved with the Boy Scouts.

Luana reported that she has a younger friend, Jane Doe. Jane's family was very close to the McKinnis family, and her brothers, John Doe 1 and John Doe 2,

---

[2] Patrick Moore is a staff member at John Brown & Associates, a Los Angeles based investigative firm.

were close friends with Dr. McKinnis' biological son.[3] Luana stated that she met with Jane Doe and asked her if she was aware of Dr. McKinnis engaging in inappropriate actions with children. Luana recalled that Jane Doe was initially shocked and then blurted out, "He's a pervert." According to Luana Unger, Jane Doe then described a disturbing incident when she spent the night at the McKinnis house when she was about 8 years old. She was sharing a room with the doctor's daughter who was asleep. Dr. McKinnis came into the room and asked her if he could give her a backrub. Jane was afraid to say "no" and that while rubbing her back, the doctor's hands kept straying down to her buttocks which he fondled repeatedly.[4]

## ii. Interview with Jane Doe

Jane Doe was interviewed telephonically for approximately 30 minutes by Patrick Moore a few days later. Jane Doe corroborated that Dr. McKinnis fondled her buttocks for a considerable period of time during the illicit "backrub." Jane Doe stated that after her meeting with Luana Unger, she phoned her brother John Doe 1, and told him about what Dr. McKinnis had done to her more than 30 years prior. She asked him if he had any knowledge about the doctor molesting children. In speaking with Jane Doe, John Doe 1 made it very clear that he did not want to testify against Dr. McKinnis and that he did not want his name used in any investigation. He did

---

[3] Dr. McKinnis also had two adopted sons, one of whom has committed suicide.
[4] It is noted that the McKinnis house was a designated neighborhood "block house" which meant that it was a safe harbor for children in need. The McKinnis house provided pool tables and pinball machines, the sort of "toys" that would naturally be attractive to children, especially boys.

LAW OFFICES OF
DAVID MICHAEL
CANTOR
ONE E. WASHINGTON ST., SUITE 1800
PHOENIX, ARIZONA 85004
www.dmcantor.com

state, however, that if these conditions were met, he would be willing to talk to Kelly Morrow's defense team.

In her interview, Jane Doe also stated that her oldest brother John Doe 2, has been angry and disturbed for as long as she can remember. He is prone to violent acting out and recently tried to burn down their parents' house. Given that John Doe 2 started spending quite a bit of time at the McKinnis house at around the age of 5 or 6, it is not unreasonable to suggest that his anger problem could possibly be related to him having been molested by Dr. McKinnis when he was very young. John Doe 2 is not available to be interviewed because he is currently estranged from his family.

### iii. Interview with John Doe 1

On November 14, 2015, John Doe 1 was interviewed telephonically by Patrick Moore for approximately 20 minutes. After being assured that he would not be identified by name and that the purpose of the interview was not to gather material that might lead to the prosecution of Dr. McKinnis, John Doe 1 spoke frankly. He stated that during his childhood, he spent the night at the McKinnis house on literally dozens of occasions. He further stated that Dr. McKinnis sexually molested him repeatedly, on at least 12 occasions and possibly more. The pattern of the molestations was similar to what Dr. McKinnis reportedly did to Jane Doe. After his biological son had gone to sleep, the doctor would enter the room that John Doe 1 was sharing with the other boy. Dr. McKinnis would begin by giving John Doe 1 a

backrub. Then, invariably, the doctor would reach lower and would fondle and caress John Doe 1's genitals and buttocks.

### iv. Interview with Brian Morrow

Brian Morrow was interviewed by Patrick Moore on October 21, 2015 at his home in Gilbert, Arizona. Brian began by stating that until Kelly's arrest, he'd been completely unaware that Kelly had any inappropriate inclinations toward children. Brian stated the boys initially knew Dr. McKinnis through school, perhaps through his daughter. Once they got to know him, the doctor was always eager to spend time with the boys.

Brian recalls that one of the doctor's favorite things was to take a group of boys to Burger King for fast food. After eating, the doctor was always reluctant to drive the children home or otherwise release them. Instead, he would sit with the children in his station wagon and ply them with questions concerning what they did of a sexual nature with little girls and/or little boys. The children being questioned typically ranged in age from 6 to 13. Brian recalls that Rusty, who was about six years old, was generally sitting on the doctor's lap during these "tell all" sessions.

Brian recalls that Dr. McKinnis was constantly surrounded by boys. They were never his own children, however; rather, they were working class kids from the neighborhood. Brian recalls that the doctor was very generous about buying YMCA memberships for the poor kids in town. This came with a caveat, however. The local YMCA had a small swimming pool in the basement. A regular sight on weekend

LAW OFFICES OF
DAVID MICHAEL
CANTOR
ONE E. WASHINGTON ST., SUITE 1800
PHOENIX, ARIZONA 85004
www.dmcantor.com

nights was a dozen or so boys cavorting in the pool with only one adult, Dr. McKinnis. While the boys played, he swam and gave them rides on his back.

### v.  Interviews with Kelly Morrow

Kelly Morrow was interviewed by Patrick Moore at MDC-LA on five occasions beginning on October 7th. The interviews in total lasted for about 16 hours. During one interview, Kelly described his interactions with Dr. McKinnis in some detail.  He also described his own early sexual experiences with boys in the neighborhood. When he was 9 or thereabouts, Kelly spent the night at Dr. McKinnis' house and slept in the doctor's Winnebago trailer with the doctor's son. Dr. McKinnis waited until after his son was asleep and entered the Winnebago. He then came over to Kelly and asked him if he could give him a back rub. Like the other children, Kelly was afraid to say "no." Kelly recalls that the doctor then began rubbing his back. Beyond that he is unsure what happened next, and does not recall whether the doctor made sexual contact in an inappropriate manner. However, he does remember that he wet the bed that night.

After that, he never again slept over at Dr. McKinnis' house. Although based on what Kelly remembers, it's impossible to determine with any certainty whether he was sexually molested that night in the Winnebago, it is revealing that during the following six months or year, Kelly began engaging in regular "advanced" sexual exploration with three other boys in the neighborhood. He recalls that although the other boys would initiate the contact, he was willing to go along with them. He

13

1  estimates that these sexual incidents occurred once or twice a month for

2  approximately two years, or until he started middle school. In his Assessment, Dr.

3  Whiting notes that according to Kelly, the three boys with whom he engaged in

4  sexual conduct also spent considerable time with Dr. McKinnis.

5  Kelly's parents separated permanently when he was 10. The family then

6  moved into a duplex at 1220 North Baltimore in Hastings. From this point forward

7  for the next few years, Kelly received very little parental supervision. Kelly recalls

8  that as soon as Dr. McKinnis realized that the Morrow boys were, for all intents and

9  purposes, fatherless, he began showing up regularly in his station wagon with a

10  carful of boys. He would invite Kelly and/or Brian to join the "party." Typically, the

11  doctor would take the boys to a nearby Burger King where he would buy them food.

12  Kelly also corroborated his brother Brian's report that after the boys had

13  eaten, instead of taking them home or otherwise releasing them, Dr. McKinnis would

14  "grill them" concerning their sexual activities, actually going around in a circle and

15  asking each boy in turn to relate his "sexual adventures." The doctor was a "knee-

16  grabber" and was prone to grabbing the boys' knees while they spoke.

17  Kelly recalled another incident when he was about 12 years old. On that

18  occasion, he was alone with the doctor who took him out to a then undeveloped area

19  behind a school on the edge of town. Kelly stated that Dr. McKinnis asked him if he

20  wanted to learn to drive. Like most boys, Kelly was eager to learn. However, Kelly

21  was required to sit on the doctor's lap. In describing this incident, Kelly stated that

ONE E. WASHINGTON ST., SUITE 1800
PHOENIX, ARIZONA 85004
www.dmcantor.com
LAW OFFICES OF
DAVID MICHAEL
CANTOR

14

he was distinctly aware that the doctor had an erection and that he felt very uncomfortable. After that, he never again sat on the doctor's lap.

Kelly also recalled that Hastings built a new YMCA in 1980, and he had a summer job there prior to his 14th birthday. During this period, Dr. McKinnis would often take three or four boys swimming at the new facility. The new YMCA had separate locker rooms for the boys and the men. The doctor, however, would insist that the boys change with him in the men's locker room and would strip completely in front of the boys.

Based on this profile of Dr. McKinnis, as reported by numerous individuals who were either molested by him, or were aware of his inappropriate actions, he clearly introduced Kelly Morrow to adult-child sexual relations. Although Kelly appears to have blocked many of the specifics concerning what Dr. McKinnis did to him, it is clear that the doctor was involved with Kelly in various ways beginning when he was about 9 years old and continuing until he was approximately 15. Dr. McKinnis clearly played a major role in short-circuiting Kelly's natural sexual development and replacing it with an unnatural obsession with adult-child sexuality.

### d. Kelly Morrow's Adolescence

In addition to Dr. McKinnis' destructive influence, Kelly Morrow's adolescence was characterized by neglect on the part of his mother, mild poverty and an early and, in the long run, disastrous introduction to drugs and alcohol. In an

LAW OFFICES OF
DAVID MICHAEL
CANTOR
ONE E. WASHINGTON ST., SUITE 1800
PHOENIX, ARIZONA 85004
www.dmcantor.com

interview, Brian Morrow recalled that their mother would be gone for days at a time and he and Kelly were frequently left to fend for themselves.

Luana allowed Kelly and Brian to drink and smoke marijuana in the house and, for an extended period of time, was generally neglectful, to such a degree that Kelly and Brian began acting out and breaking into businesses. They were taken down to the Sheriff's Office and held briefly in custody. This was a wakeup call for Luana and the boys. She became more attentive to what they were doing, and although the twins continued to party and experiment with drugs after being placed on probation, they never took part in another burglary.

Kelly tried mushrooms and LSD in the 8th grade and smoked marijuana and nicotine on a regular basis. Despite this, he was a rather popular teen and always had plenty of friends. His teachers were aware that he was a bright child and encouraged him to do his homework but to little avail. He ultimately dropped out of high school in the 12th grade but earned his GED two years later.

### e. Early Adult Work Experience

Although he continued to drink regularly and smoke marijuana, after high school, Kelly settled down quickly. In spite of his damaging and chaotic childhood, Kelly had developed a strong work ethic, and after leaving high school, in 1986, he went to work for a construction company in Alliance, Nebraska.

Based on his willing attitude and obvious intelligence, Kelly quickly moved up the ranks and was soon promoted to heavy equipment operator. He worked on

jobs in Oklahoma City; Austin, Texas; Tampa, Florida; Louisville, Kentucky; and Fort Drum, New York, among others. Although he thrived in the work atmosphere, like many other working men, he got in the habit of going to the bar after work and often drank heavily.

In 1988, Kelly moved to Landscapes Unlimited, which was at that time was the nation's largest golf course installation company. Kelly was a quick learner and once again he moved quickly up the ranks. Initially, he worked on golf courses in Baltimore, Maryland; Charleston, South Carolina; and the Poconos Mountains of eastern Pennsylvania. Over the next few years, he took on ever-increasing responsibility at installations in Nashville, Tennessee; Muscle Shoals, Alabama; San Antonio, Texas; Myrtle Beach, South Carolina and others. By the time he left Landscapes Unlimited in 1993, Kelly was earning over $50,000 annually even though he was only 27 years old.

**f. Marriage and Further Work Experience**

As a child growing up in Hastings, Kelly had always been close friends with Paula Bales, whom he met in elementary school. They married in 1993, while pregnant with their first daughter Mackenzie. Kelly worked for Wadsworth, another construction company, from 1993 through 1997. Based on his growing expertise in the trade, he was soon named a project superintendent and found himself managing hundreds of people on large projects. Kelly's first assignment with Wadsworth was

17

LAW OFFICES OF
DAVID MICHAEL
CANTOR
ONE E. WASHINGTON ST., SUITE 1800
PHOENIX, ARIZONA 85004
www.dmcantor.com

in Vail, Colorado. After a brief stopover in Phoenix, Arizona, he was offered a superintendent position at the Taquitz Creek course in Palm Springs, California.

After completing the Palms Springs project, Kelly was dispatched to Sun Valley, Idaho to supervise the installation of a new golf course associated with Hale Irwin, a well-known professional golfer. During this period, the Morrow's second daughter Chloe was born in Ketchum, Idaho in March of 1995. From there it was on to Scottsdale, Arizona where Kelly served as construction superintendent during the building of the Troon North Golf Club. His final major project with Wadsworth was supervising the Rancho San Marcos project near Santa Barbara, California. Kelly and Paula's third daughter Mayson was born in February of 1997 while this project was still ongoing.

### g.   Settling Down/Hard Adjustment

After four years with Wadsworth, Kelly went back to work at Landscapes Unlimited in 1998. He spearheaded an installation in Broomfield, Colorado and was then assigned to oversee the installation of three high end courses near Simi Valley, California. This was a huge job which took 11 months to complete and employed literally hundreds of workers. Based on Kelly's excellent performance, in 2000, he was promoted to General Superintendent, and he and Paula decided to put down stakes in Phoenix.

Somewhat to his surprise, Kelly discovered that even though in theory it was an excellent opportunity, he was not able to handle the workplace demands of being

18

a General Superintendent rather than a project superintendent. While it was no longer necessary to constantly relocate his family, Kelly found that he traveled frequently, attended countless meetings and oversaw multiple projects, often as many as 10 at a time. He Kelly realized  that he was better suited to be an on-the-job superintendent rather than a higher level Manager. He was torn, however, and knew that his family needed him to stay in one place now that all three girls were in school.

### h.  Addiction to Methamphetamine and Child Pornography

While they were still in high school, Kelly, his twin brother Brian, and his younger brother Scott were all introduced to methamphetamine.  Although Brian has used the drug occasionally during his adult life, it has never caused him any serious problems. Scott, however, has served a federal prison sentence in Nebraska for trafficking methamphetamine.[5]

As for Kelly, after being introduced to the drug while no more than 16 or 17 years of age, he used it periodically during his twenties and thirties, usually in conjunction with large amounts of alcohol. Although it never became a serious problem, between 1986 and 2000 Kelly smoked crystal methamphetamine when it came his way through his contacts among the construction workers.

---

[5] The entire Morrow family is genetically predisposed to drug and alcohol abuse.  Kelly's father Robert Morrow has been a regular beer drinker throughout his adult life, and his brothers (Kelly's paternal uncles) have reportedly struggled with alcoholism.  Kelly's maternal grandfather Woody was a serious alcoholic for much of his life.  Kelly's mother Luana became a habitual drug user and drinker after splitting up with Robert Morrow. She has used methamphetamine and other drugs on an occasional basis throughout her adult life, and still drinks on a fairly regular basis.  As stated above, beginning in adolescence, Kelly Morrow, his twin brother Brian, and his younger brother Scott have all used methamphetamine to varying degrees.

LAW OFFICES OF
DAVID MICHAEL
CANTOR
ONE E. WASHINGTON ST., SUITE 1800
PHOENIX, ARIZONA 85004
www.dmcantor.com

Beginning in 2000, however, Kelly became a full-blown methamphetamine addict. He recalls that his pattern was to obtain a supply and smoke it on a daily basis for the next week or ten days. When its effectiveness waned, he would lay off the drug for a week or two so that he could obtain some much needed sleep and regain some degree of physical and mental equilibrium.

In interviews conducted at MDC-LA, Kelly stated that during his years of on-the-job travel, in the back of his mind, he was always aware that he harbored the desire to achieve some degree of physical intimacy with male children, a desire that clearly stems from his own history of sexual abuse. Although Kelly periodically struggled with these urges, he never acted upon them and did his best to focus on work and his family.

Beginning in 2000, though, as he became increasingly dependent on methamphetamine, Kelly found himself obsessively dwelling on young boys. This led to him collecting and viewing child pornography while under the influence of the drug. He reports that during the periods when he was not using the drug, he would feel extreme guilt for having downloaded the images. Like many addicts, Kelly was unable to control his desire for methamphetamine which conjointly led to him downloading images of child pornography.

### i.  Downward Spiral/Divorce/Community Involvement

Family members recall that as Kelly became increasingly dependent on methamphetamine, his behavior became somewhat bizarre. He would sometimes

20

spend most of the night in the backyard working on a swimming pool he was building. On other nights, he would spend hours rearranging the furniture or otherwise "tweaking" indoors.

It all came to a head in 2005. Kelly's work performance had become increasingly erratic and his employer confronted him and demanded that he undergo drug testing. Kelly confessed that he had a methamphetamine problem and entered a residential drug and alcohol rehab facility in Chandler, Arizona. While in rehab, Landscapes Unlimited terminated Kelly and Paula informed him that she was filing for divorce.

After completing rehab, Kelly did everything in his power to save his marriage but too much damage had been done and the divorce was finalized in January of 2006. The family residence was sold and Kelly moved into an apartment. He found a new job with Sema, a golf course installation company. For the next three years, Kelly paid his child support religiously and spent considerable time with his daughters. Despite his myriad problems, during the 2000 to 2008 timespan, Kelly remained involved with the community in a distinctly positive fashion, coaching his daughters' soccer teams, and volunteering at their schools and at church.

Following his divorce, Kelly slowly sank into ever-deepening depression. Although he managed to keep his new job with Sema, he continued to "binge" periodically on methamphetamine and continued to intermittently collect child

pornography. Kelly realized that he could not continue smoking methamphetamine and collecting child pornography but was unable to control his addiction.

### j.  Offense

In 2008, Kelly decided his best hope was to change his life dramatically.  He sent out his resume and based on his decades of experience and strong work history, found employment working for Flagstick, a Phoenix-based golf course installation company with contracts in China. Kelly was hired as a sub-contractor/Project Manager, and on August 28, 2008, he was dispatched to Pinggu, a small city an hour's drive east of Beijing. His job was to oversee the installation of a high end golf course at Jin Hai Lake east of Pinggu in the mountains.

In the offseason, Kelly typically performed volunteer work either in Beijing or at various Southeast Asia locations. He taught English at a school in Beijing, sponsored children orphaned by HIV/AIDS, and participated in volunteer work camps in impoverished areas in Asia. Unfortunately, while in China, Kelly entered into a relationship with several Chinese boys that ultimately became sexual in nature. In his Assessment, Dr. Whiting writes:

> Kelly now reflects on how fulfilled he felt in that he was able to provide "fathering" for these boys that were in such difficult situations.  There is a striking similarity between Kelly's early abuse at the hands of Dr. M and Kelly's behavior to the victims in this case.  Kelly, like many victims of sexual abuse replicated the conditions of his own abuse with these young boys and he became the very thing he abhorred.

(Exhibit 1, at 7).

22

1

2          On the MMPI (Minnesota Multiphasic Personality Inventory-2) test

3   administered by Dr. Whiting, Kelly Morrow produced a profile characteristic of a

4   man who keeps his feelings "bottled up." Dr. Whiting describes this at the "worst

5   possible environment for a child who was the victim of sexual abuse as they would

6   have no means of revealing their abuse because the home environment was

7   incapable of managing and therapeutically addressing any type of pronounced

8   disturbance caused by emotional harm or injury." (Exhibit 1, at 8).

9          Thus, while enduring sexual abuse by Dr. McKinnis, Kelly was

10  simultaneously taught to suppress his feelings of pain and confusion. This

11  combination made it impossible for Kelly to be aware of the real issues that plagued

12  him throughout his adult life. Because of this, until very recently, he had not made

13  the obvious connection between being abused by Dr. McKinnis as a child and the

14  fact that more than three decades later he found himself repeating the tragic cycle of

15  his own abuse.

16

17         If Kelly Morrow had received help when he needed it as a child, he could

18  have certainly been rescued from a life that – despite all his hard work and good

19  intentions – had been fraught with sadness and lack of fulfillment. According to Dr.

20  Whiting, however, now that Kelly has taken the first painful steps toward self-

21  understanding, there is no reason to believe that he cannot undergo profound healing

22  both while in custody and after his release.

23

24

25

LAW OFFICES OF
DAVID MICHAEL
CANTOR
ONE E. WASHINGTON ST., SUITE 1800
PHOENIX, ARIZONA 85004
www.dmcantor.com

## 2.    18 U.S.C. §3553(a)(2): The need for the sentence imposed to meet the traditional objectives of the criminal justice system.

18 U.S.C. §3553(a)(2) directs the Court to consider the need for the sentence imposed to comport with traditional goals of a criminal justice system such as protecting the public, deterring criminal conduct, and providing the defendant with needed treatment. Mr. Morrow understands the seriousness of the offense and has had an opportunity to reflect on the consequences of his actions. Mr. Morrow feels extreme remorse for his inappropriate involvement with children and collection of child pornography. Furthermore, the public will be protected from future crimes both through Mr. Morrow's incarceration and his lifetime supervised release with sex offender conditions.

There is no denying that Mr. Morrow's offense conduct is very serious. The victimization of children must be punished appropriately. The requested 15 year term of imprisonment, however, is a very long time and in no way constitutes leniency. Furthermore, the overwhelming collateral consequences that Mr. Morrow, as a registered sex offender, will endure for the rest of his life, serve as rigorous additional punishment.

Any federal felony conviction results in the loss of numerous civil rights including the right to vote, the right to hold public office, the right to serve on a jury, the right to possess a firearm, and the right to social security benefits. The "social

LAW OFFICES OF
DAVID MICHAEL CANTOR
ONE E. WASHINGTON ST., SUITE 1800
PHOENIX, ARIZONA 85004
www.dmcantor.com

death" that convicted felons experience long after they pay their debt to society can hardly be exaggerated.

Mr. Morrow's conviction will affect him drastically for the rest of his life, not only with respect to the loss of civil rights and the various structures he will need to comply with, but also with respect to his standing in his community. Many of those with whom he comes in contact with will learn that he is a convicted sex offender which will cause him to be viewed as an outcast. This chastened individual, who throughout his adult life, has worked very hard, primarily as a high level construction supervisor, will be labeled as an undesirable within the community of his adult peers. He will not only face myriad practical sanctions but will also be the source of shame and disgrace to those around him. Furthermore, despite his high level of construction expertise, Mr. Morrow may well struggle to find another decent job upon his release from prison. This conviction will be a millstone around his neck for the rest of his life.

In order to ensure that Mr. Morrow remains law-abiding following his release from prison, the U.S. Probation Office will institute a variety of additional conditions including treatment requirements, restrictions on internet use, residence and contact restrictions, movement restrictions, employment/occupational restrictions, search conditions, treatment conditions, tracking conditions, restrictions of possession of materials, and restrictions on drug and alcohol use.

25

These restrictions will serve to guarantee that Mr. Morrow never again engages in and/or attempts to engage in any sexual activity of any sort concerning children, while still giving him the opportunity to rebuild his life to whatever degree possible upon his release from custody. It is further noted that a 15 year term of incarceration is more than enough to hammer home the lesson that society absolutely will not tolerate any form of adult/child sexuality.

## III.   Conclusion

For all of the foregoing reasons, counsel urges this Court to find that the just, reasonable and appropriate individualized sentence for Mr. Morrow is a fifteen (15) year term in the Bureau of Prisons to be followed by lifetime supervised release. The proposed sentence combined with a lifetime of rigorous supervised release, including all necessary psychotherapeutic counseling, will certainly deter Mr. Morrow from ever again collecting child pornography or attempting to engage in any further illicit sexual activities with children.  Such a sentence would be "sufficient but not greater than necessary" and would effectuate just punishment in this matter, while allowing Mr. Morrow to return to society, albeit under the strictest supervision.  The requested sentence would incapacitate Mr. Morrow for an adequate period of time and would satisfy the sentencing factors set forth in 18 U.S.C. §3553(a).

**RESPECTFULLY SUBMITTED** this 5th day of July, 2016.

Elizabeth Mullins
Law Offices of David Michael Cantor
1 East Washington St., Suite 1800
Phoenix, Arizona 85004

### Certificate of Service

I hereby certify that on this date, I electronically transmitted the attached document to the Clerk's Office using the CM/ECF system for filing:

Honorable S. James Otero
United States District Judge
Central District of California

Robyn Bacon
Assistant United States Attorney

Kathryn Herrera
United States Probation Office

By: _____